# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:25-cv-26 |
| | ) | |
| v. | ) | |
| | ) | |
| SOUTHEAST BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

## INTRODUCTION

1. The United States of America brings this action against SouthEast Bank ("the Bank" or "SouthEast") for discriminating against Black and American Indian/Alaska Native ("AI/AN") post-secondary education graduates in its student refinance loan product lending across the United States.

2. This action to enforce provisions of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and its implementing regulation, Regulation B, 12 C.F.R. Part 1002, seeks to redress the discrimination based on race that SouthEast engaged in through Education Loan Finance, an online student loan consolidation and refinance program designed "to provide low-cost student loan refinancing options" across the United States (the "ELFI Refinance Program").

3. Since its launch in December 2015, the ELFI Refinance Program has required applicants to graduate from an "eligible school" to qualify for an ELFI Refinance Program loan.

4. Up until April 5, 2021, SouthEast defined an eligible school, in part, as one that fell below the Cohort Default Rate ("CDR") threshold that SouthEast management periodically

established based on annual, national CDR averages. The CDR is a number calculated by the United States Department of Education for institutions of higher education that represents the percentage of that institution's students who default on certain federal student loans within three years of starting repayment. Under this "CDR Policy," SouthEast automatically denied graduates of schools with CDRs above its established thresholds.

5. SouthEast's CDR Policy disproportionately excluded Black and AI/AN degree recipients as compared to similarly situated graduates of other demographic groups. For example, under the CDR Policy, Black bachelor's degree recipients were as much as 4.31 times more likely to be excluded than bachelor's degree recipients who were not Black. AI/AN Bachelor's degree recipients were as much as 2.98 times more likely to be excluded than comparable degree recipients who were not AI/AN. In contrast, and with limited exception, bachelor's degree recipients of other races and national origins were more likely to be included than excluded under the CDR Policy.

6. SouthEast's CDR Policy disproportionately excluded majority-Black post-secondary institutions, including Historically Black Colleges and Universities ("HBCUs"). For example, SouthEast's CDR Policy excluded as many as 84.4 percent of majority-Black schools. In contrast, it excluded no more than 21.14 percent of non-majority Black schools.

7. When SouthEast's CDR Policy operated to deny credit to graduates, SouthEast failed to provide those applicants with proper notification of their denial.

8. SouthEast lacked a legitimate, non-discriminatory reason for its CDR Policy. Denials based on CDR were not based on individual creditworthiness or justified by secondary market pressures. Even if SouthEast's policy was based on a legitimate reason, less-discriminatory alternatives to the CDR Policy existed.

9. SouthEast's CDR Policy and its failure to notify applicants of their denials caused Black and AI/AN graduates significant economic and other harm.

10. The United States brings this lawsuit to hold SouthEast accountable for its serious violations of law and to remedy the substantial and widespread harmful consequences of its discriminatory lending policies and practices.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 15 U.S.C. § 1691e(h).

12. Venue is proper in this Court under 28 U.S.C. § 1391 because SouthEast conducts business, and its principal place of business is located, in this District.

## PARTIES

13. The United States is authorized to initiate a civil action in federal district court whenever a matter is referred to the Attorney General under 15 U.S.C. § 1691e(g) or when the Attorney General has reason to believe that a pattern or practice in violation of ECOA has occurred. 15 U.S.C. § 1691e(h).

14. Defendant SouthEast Bank is a state-chartered, community bank formed in February 2013 with a principal place of business located at 12700 Kingston Pike in Farragut, Tennessee. The Bank is chartered by the State of Tennessee and supervised by the Federal Deposit Insurance Corporation ("FDIC"). It is a wholly owned subsidiary of SouthEast Bancorp, Inc.

15. SouthEast shares responsibilities related to the ELFI Refinance Program with Education Loan Finance, Inc. ("ELFI, Inc."), a not-for-profit holding company and the parent company of SouthEast Bancorp, Inc.

16. SouthEast originates all loans for the ELFI Refinance Program using a loan

origination system ("LOS") launched in April 2017 by ELFI, Inc. The ELFI Refinance

Program's LOS is a platform used in underwriting where users create a profile and complete

their refinancing or student loan application. According to SouthEast, the LOS "allows ELFI,

Inc. to prequalify applicants and provides a highly automated underwriting engine and user-

friendly application process."

17.  As of April 30, 2024, SouthEast Bank funded over $2.96 billion in ELFI loans to

more than 25,000 borrowers in Washington, D.C. and every state and territory of the United

States.

18. SouthEast also sells consolidated loans to investors on the secondary market

("securitizations"). In these securitizations SouthEast serves as "The Originating Lender" and

ELFI, Inc. is the "Sponsor" and "Administrator" that purchases loans from SouthEast before

financing them through subsidiaries on the secondary market.

19. Between 2018 and 2022, SouthEast completed at least four ELFI Refinance Program

securitizations valued at over $1.14 billion, including a $316.23 million sale in 2022. SouthEast

has completed additional securitizations since 2022. In June 2024, for example, its

securitization with $270.35 million in loans received the highest credit rating agency rating.

20. SouthEast is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and

Regulation B, 12 C.F.R. § 1002.2(l).

## FACTUAL ALLEGATIONS

### Background

21. The FDIC referred the matter to the Department of Justice on May 24, 2021, under

ECOA, 15 U.S.C. § 1691e(g).

22. The FDIC based its referral, in part, on its finding that under the CDR Policy,

graduates from less than 15 percent of HBCUs could apply for an ELFI Refinance Program

loan, regardless of those graduates' individual creditworthiness. By contrast, the FDIC found

that graduates of almost 80 percent of non-HBCUs could apply for an ELFI Refinance Program

loan.

23. Title IV of the Higher Education Act of 1965 ("Title IV"), which established federal

loan and grant programs that the Department of Education administers, requires the Department

of Education to annually publish the CDR for all institutions of higher education within each

State. *See* 20 U.S.C. § 1080(e)(1).

24. CDR is, for schools with 30 or more borrowers, the percentage of a school's

borrowers who enter repayment on loans from the William D. Ford Federal Direct Loan

Program ("Direct loans"), or its precursor, the Federal Family Education Loan Program

("FFELP loans"), during a particular federal fiscal year and default (i.e., are more than 360 days

delinquent) or meet the other specified conditions in a three-year period. For example, 2019

CDRs, published in 2022, reflect borrowers who entered repayment at each institution of higher

education in 2019 and defaulted in 2019, 2020, or 2021, divided by the institution's borrowers

entering repayment in 2019.

25. CDR calculations do not include all federal student loans, such as certain loans

available only to students pursing advanced degrees (i.e., master's and doctorate degrees).

26. Higher CDRs are typically driven by students that do not receive degrees.

27. The Department of Education uses CDR to determine aid eligibility under Title IV.

The Department of Education deems schools with three consecutive CDRs above 30 percent or

a single CDR above 40 percent as Title IV ineligible and, therefore, the students who attend

those schools are ineligible for Federal Direct Loans or Federal Pell Grants. Schools may appeal

and avoid ineligibility for a variety of reasons, including by demonstrating that they educate high numbers of low-income students and have high placement or completion rates.

28. For over a decade, lenders have known or should have known that using the school an applicant attended in establishing loan eligibility, including CDR, may contribute to discriminatory outcomes for students of color.

29. In 2012, the Consumer Financial Protection Bureau ("CFPB"), directed by Congress, issued a public report ("1077 Report") on private education loans that specifically criticized using CDR in lending because of its potential to disparately impact students of color. The 1077 Report cautioned that "student lenders' use of CDR at very low default levels may present fair lending concerns because . . . racial and ethnic minority students are disproportionately concentrated in schools with higher CDRs[,]" and using CDR for "loan eligibility, underwriting, and pricing may have a disparate impact on minority students by reducing their access to credit[.]" Specifically, Black and Hispanic students were "almost twice as likely as students generally to attend schools with" CDRs above cutoffs of 8 and 12 percent.

30. The 1077 Report emphasized that, while CDR "may be correlated with the value of a degree from a particular school," it "was not specifically intended to assist private lenders in eligibility, underwriting, and pricing decisions, particularly at much lower" default levels. Thus, "general reliance on CDR to set [loan] eligibility cutoffs . . . may raise a threshold fair lending concern, requiring further analysis by lenders to" show a valid need to use CDR.

31. In July 2020, several United States Senators issued a report ("2020 Senate Report") on the use of non-individualized education-related data in credit assessment by six major financial services providers. The 2020 Senate Report warned that using "the school an applicant attended to determine creditworthiness" may violate ECOA and Regulation B.

32. These risks were noted by the student lending community. For example, in 2017 the law firm Ballard Spahr LLP commented in its public-facing "Consumer Finance Monitor" that a lender's underwriting process that "uses the identity of the college attended by the applicant" was "very strange and in tension with the CFPB's repeated attacks on the use of [CDR] and other school-specific variables in student loan underwriting."

33. Thus, SouthEast knew or should have known about fair lending risks associated with using CDR to determine loan eligibility.

**SouthEast's Use of CDR for Student Loan Eligibility**

34. The ELFI Refinance Program employs eligibility requirements related to applicants' educational background. Applicants must have graduated from an "eligible school" to obtain an ELFI Refinance Program loan. From December 2015 until April 5, 2021, SouthEast's credit risk policy defined an "eligible school" as one that met the following criteria ("School Eligibility Criteria"):

- is Title IV eligible at the time of final approval;

- is a non-profit institution;

- offers bachelor's, master's and/or doctorate degrees; and

- "meets the threshold that management periodically establishes for the 3-year Cohort Default Rate (CDR)[,] as published by the Department of Education."

35. The ELFI Refinance Program's CDR "threshold" was the national average CDR for all institutions for a given year (referred herein as the "CDR Policy").

36. SouthEast did not factor CDR into loan pricing or consider CDR in relationship to its other underwriting criteria, including credit score or income requirements. Rather, if an applicant's alma mater had a CDR that exceeded the national average, SouthEast did not allow

7

the person to continue the application and refused to further assess their creditworthiness.[1]

37. SouthEast did not separately evaluate undergraduate degree recipients from advanced degree recipients. SouthEast applied the CDR Policy to all applicants irrespective of whether they held bachelor's, master's, or doctorate degrees, notwithstanding the decline in the student loan default rate as students obtain higher degrees.

38. The CDR Policy automatically denied all graduates of schools with CDRs above the national average.

39. SouthEast's CDR Policy denied individuals based on their school's CDR at the time of application. It did not seek to evaluate applicants based on the school CDR associated with their time of graduation.

40. Table 1 lists the ELFI Refinance Program's CDR Policy thresholds and the period each threshold was in place:

| Table 1: CDR Policy Thresholds Used by SouthEast and Associated Dates | | |
|---|---|---|
| *3-year CDR* | *CDR Threshold* | *Dates Used for the CDR Policy* |
| 2017 | 9.7 | 10/13/2020 - 04/05/2021 |
| 2016 | 10.1 | 02/14/2020 - 10/12/2020 |
| 2015 | 10.8 | 09/26/2018 - 02/13/2020 |
| 2014 | 11.5 | 10/16/2017 - 09/25/2018 |
| 2013 | 11.3 | 12/02/2016 - 10/15/2017 |
| 2012 | 11.8 | 07/20/2016 - 12/01/2016 |
| 2011 | 11.7 | 12/01/2015 - 07/19/2016 |

41. Graduates of 1,427 schools could apply under every CDR Policy threshold used between April 2017—when SouthEast first implemented its LOS—through April 5, 2021 ("the LOS period"). Of the 1,427 schools, only seven were majority-Black, defined as those schools

---

[1] If an applicant attended multiple schools and only some were eligible under the CDR Policy, the applicant could move forward based on the school(s) that met SouthEast's School Eligibility Criteria.

matriculating more than 50 percent Black students in every school year ending in 2015 through 2020. Those schools meeting the School Eligibility Criteria under each CDR Policy threshold used in the LOS period are listed in Exhibit 1.

42. SouthEast's decision to tie its CDR Policy to application date rather than graduation date meant certain graduates could apply in some years and not others. Graduates of 391 schools, including 39 majority-Black schools, were considered ineligible some years during the LOS period but not others. Those schools eligible in some years but not others during the LOS period are listed in Exhibit 2.

43. For example, a 2016 graduate with a high credit score from Tuskegee University, an HBCU in Alabama, was eligible to apply only from October 2017 through September 2018. SouthEast would automatically reject that person if they applied in 2016, most of 2017, or October 2018 through April 2021.

44. Graduates of 259 Title IV eligible, non-profit institutions offering bachelor's, master's, and doctorate degrees (SouthEast's "non-CDR School Eligibility Criteria") with a CDR above the threshold ("CDR Ineligible School") were denied access to an ELFI Refinance Program Loan during the entire relevant period due to the CDR Policy. Of these 259 institutions, 63 were majority-Black schools. For example, SouthEast did not include Morehouse College, an HBCU in Georgia, or the University of the District of Columbia, an HBCU in Washington, D.C., on its roster of eligible schools in any year during the LOS period. Schools that met the non-School Eligibility Criteria every year during the LOS period that were always excluded by the CDR Policy are listed in Exhibit 3.

45. As described in more detail in Paragraphs 67 through 75, SouthEast's CDR Ineligible Schools graduated higher rates of Black and AI/AN individuals than SouthEast's

eligible schools.

46. SouthEast applied the CDR Policy to all graduates irrespective of their race or national origin.

47. The CDR Policy is a uniform standard of denying credit applications and an "aspect of a credit transaction," as that term is understood under ECOA. *See* 15 U.S.C. § 1691(a); *see also* 12 C.F.R. § 1002.2(m). It is a bright-line determination that demarcates who is barred from obtaining a loan based on whether their school's CDR is above or below that year's average.

48. SouthEast posted its list of eligible schools on its website for potential applicants. As described in Paragraphs 42 and 44, many majority-Black schools were not included on this list.

49. In addition to listing eligible schools on its website, SouthEast relied on its customer base to generate more business. For example, SouthEast provided referral bonuses to existing customers who referred friends, family members, and fellow graduates to their loan programs. Additionally, SouthEast used social media "lookalike" advertising that targeted advertisements at prospective applicants who shared similar characteristics with their existing customers.

50. Graduates of CDR Ineligible Schools were discouraged from applying for ELFI Refinance Program loans because their schools were not listed on SouthEast's website as an "eligible school." As described in more detail in the following paragraphs, those individuals have suffered injury and damages because of SouthEast's conduct, making them aggrieved within the meaning of ECOA, 15 U.S.C. § 1691e.

### SouthEast's Application Process

51. SouthEast required that all applicants take certain affirmative steps to access the ELFI Refinance Program. The ELFI Refinance Program application process begins with the applicant entering basic information on the ELFI website through SouthEast's LOS. To apply

and obtain a pre-verified decision to refinance or consolidate their student loans, SouthEast required each person to first:

    a.   Sign up on the ELFI website with a username and passcode;

    b.   Verify an email address by entering a code that the LOS sent to their email; and

    c.   Fill out required fields, including by selecting from a drop-down list of schools.

52. Once applicants filled in the required fields, they could select a "Get My Rate" button that, after a soft credit pull, provided them preliminary credit decisions within 30 seconds, subject to their submitting verification information.

53. Applicants could not manually enter schools omitted from the prepopulated, drop-down list. This drop-down list excluded schools ineligible under the School Eligibility Criteria, including those that failed to meet ELFI's then current CDR Policy threshold. If a school was not chosen from the list at the time a person tried to select "Get My Rate," the system would display the following message to the applicant: "Please select a school from the list."

54. A 2018 graduate of Morehouse College with a 790-credit score applying for a loan in March 2020 would not have found his school on the ELFI Refinance Program website's drop-down list. Nor would a 2020 law degree recipient from the University of the District of Columbia with an exemplary credit score and high income.

55. SouthEast's LOS did not allow graduates of CDR Ineligible Schools to move forward with their application by accurately representing their alma mater. If any of the fields were not populated or had improper information, the system prompted the consumer with an applicable message and did not allow them to proceed through the "Get My Rates" page.

56. While the CDR Policy was in effect, more than 44,000 individuals created an account and verified their email address through the ELFI Refinance Program's website but did

not proceed through the "Get My Rate" stage. Approximately a quarter of all individuals who created an account through the ELFI Refinance Program website fit into this category.

57. At least a few individuals from CDR Ineligible Schools reached out to SouthEast but could not progress with their application. And likely more than a few of the more than 44,000 persons who created an account and verified their email address would have met SouthEast's non-CDR School Eligibility Criteria had they not graduated from a CDR Ineligible School.

58. Those individuals meeting the non-CDR School Eligibility Criteria that graduated from CDR Ineligible Schools and created an account or otherwise reached out to SouthEast to apply through the ELFI Refinance Program have suffered injury and damages because of SouthEast's conduct, making them aggrieved applicants within the meaning of ECOA, 15 U.S.C. § 1691e.

59. As a result of this CDR Policy, applicants from CDR Ineligible Schools were denied a student refinance loan before they even completed the application.

60. SouthEast denied student refinance loans at the "Get My Rate" stage for other reasons. For example, just as it required applicants to select their school of graduation, SouthEast's application process requires applicants to select their citizenship status and degree type from drop-down lists with limited options matching eligibility criteria. If a degree type is left blank (i.e. because the applicant does not have at least a bachelor's degree), or if "U.S. Citizen" or "Permanent Resident" is not selected, at the time the customer tries to advance to the "Get my Rates" page, the system displays an error message to the applicant that the missing field "is required."

61. SouthEast did not provide applicants unable to proceed through the "Get My Rate" stage with a notification that disclosed the reason(s) for their rejection that relate to and describe

the factors actually considered by SouthEast. Instead, SouthEast evaluated information about the consumer (for example, that an eligible school was not selected), declined the consumer credit based on that information, and communicated this to the consumer with an error message noting that the consumer failed to enter the name of an eligible school or otherwise failed to provide information demonstrating eligibility.

62. For those who attended institutions meeting the School Eligibility Criteria and otherwise advanced through the "Get My Rates" page, the ELFI Refinance Program LOS performed a soft credit pull and "prequalification review." This review immediately rejected applicants who did not meet ELFI's "hard knock-out" rules,[2] had credit scores below 680, or lacked an eligible degree (i.e. at least a bachelor's degree) from an eligible school, among other qualifications.[3]

63. SouthEast applied the CDR Policy to all graduates under the ELFI Refinance Program irrespective of their race up through April 5, 2021, after which date it discontinued the CDR Policy without replacement.

64. The Bank's In-School loan program, an ELFI product begun in a limited scale in April 2019 and expanded into a national program in June 2021, has not used CDR in underwriting.

65. Other actors in the student loan refinance market do not use CDR cutoffs to reject applicants.

66. After SouthEast eliminated its CDR Policy, more than 690 individuals from schools

---

[2] Hard knock-outs include factors typically seen on a credit report, such as an unpaid negative public record in the past seven years, a record of default or delinquency of 60 days past due or more on any student loan within the past 24 months, or less than 36 months of credit history.
[3] Other qualifications include, for example, that applicants have an income of at least $35,000.

that would have likely been CDR Ineligible Schools under the last used CDR Policy threshold submitted applications seeking more than $42 million in student loans through SouthEast's LOS. These individuals include over 230 advanced degree and 460 undergraduate degree recipients. At least those, and likely many more such individuals, first created accounts through the ELFI Refinance Program website and selected "Get My Rate." These 690 individuals would likely have been automatically denied credit at the "Get My Rate" stage if SouthEast's last CDR Policy threshold was still in effect.

### Racial Disparities under SouthEast's CDR Policy

67. According to the National Center for Education Statistics ("NCES") during 2019-2020, 61 percent of students earning bachelor's degrees graduated with student loan debt.[4] Black and AI/AN students disproportionally bore this debt: 82.9 percent of Black and 75.1 percent of AI/AN students graduated with student loan debt, compared to 60.9 percent of white and 40.8 percent of Asian American students.[5] Of graduates earning bachelor's degrees, 59.2 percent had federal loans and 14.6 percent had non-federal student loan debt. The vast majority—97 percent of all student loan debt holders earning bachelor's degrees—held at least some federal debt.

---

[4] Department of Education, *NCES Digest of Education Statistics*, Table 331.95, https://nces.ed.gov/programs/digest/d23/tables/dt23_331.95.asp (last visited Nov. 18, 2024).
[5] As used in this Complaint, "white" means non-Hispanic white.

68. As described in paragraphs 69 through 75, NCES data illustrate that Black and AI/AN students graduated at higher rates from CDR Ineligible Schools than did graduates of other races and national origins.[6]

69. Table 2 shows the percent of graduates earning bachelor's degrees within each race and national origin group and under each CDR Policy threshold during the LOS period who met SouthEast's non-CDR School Eligibility Criteria but, because they graduated from a CDR Ineligible School, were barred from completing an application. As seen in Table 2, around one fifth of all Black graduates would have been barred under each CDR Policy threshold due to their school. This rate is between triple and quintuple that of white graduates.

| Table 2: Bachelor's Percent of Race and National Origin Excluded | | | | | | |
|---|---|---|---|---|---|---|
| **CDR Period** | **AI/AN** | **Asian** | **Black** | **Hispanic** | **NH/PI[7]** | **White** |
| 12/02/2016 - 10/15/2017 | 16.98% | 1.32% | 19.93% | 6.92% | 4.31% | 4.37% |
| 10/16/2017 - 09/25/2018 | 16.44% | 1.26% | 17.90% | 5.94% | 4.22% | 4.12% |
| 09/26/2018 - 02/13/2020 | 14.96% | 1.38% | 17.78% | 6.67% | 4.87% | 4.36% |
| 02/14/2020 - 10/12/2020 | 22.16% | 1.92% | 22.02% | 6.53% | 12.01% | 6.21% |
| 10/13/2020 - 04/05/2021 | 20.71% | 3.08% | 24.51% | 8.62% | 12.97% | 7.84% |

70. If the CDR policy had no impact based on race, the percent of excluded graduates who are Black would approximate the overall percent of graduates who are Black. Otherwise stated, comparing those two percentages would result in a ratio close to one. NCES data illustrate, however, that the CDR Policy excludes a disproportionate number of Black and AI/AN graduates.

---

[6] Department of Education, NCES, Integrated Postsecondary Education Data System ("IPEDS"), Complete Data Files, https://nces.ed.gov/ipeds/datacenter/DataFiles.aspx?year=-1&surveyNumber=3&sid=369b5aca-47b2-4547-8887-3531ca539281&rtid=7 (last visited Nov. 19, 2024).

[7] "NH/PI" stands for Native Hawaiian/Pacific Islander.

71. For example, under the 10.8 CDR Policy threshold used by SouthEast between September 26, 2018, and February 13, 2020, Black students made up 9.42 percent of the preceding years' total bachelor's degree recipients from schools meeting the non-CDR School Eligibility Criteria, but they made up 28.16 percent of bachelor's degree recipients from CDR Ineligible Schools. AI/AN graduates made up 0.46 percent of the total bachelor's degree recipients, but more than double that rate—or 1.16 percent—of those bachelor's degree recipients barred. In contrast, white graduates made up 62.06 percent of the total bachelor's degree recipients, but 45.47 percent of all those barred.

72. Table 3 shows the relationship between those bachelor's degree recipients of a single race or national origin excluded under the CDR Policy and their share of the total bachelor's degree recipients from schools meeting the non-CDR Eligibility Criteria. This "disparity ratio" is calculated by dividing the former (the excluded group) by the latter (the excluded group's share). For example, the 2.99 ratio for Black bachelor's degree recipients under the CDR Policy threshold in effect between September 26, 2018, and February 13, 2020, is calculated by dividing 28.16 percent by 9.42 percent. Ratios greater than one reflect disproportionately worse outcomes, meaning greater exclusion by the CDR Policy; ratios less than one reflect better outcomes, meaning more inclusion by the CDR Policy.

| Table 3: Bachelor's Disparity Ratio | | | | | | |
|---|---|---|---|---|---|---|
| CDR Period | AI/AN | Asian | Black | Hispanic | NH/PI | White |
| 12/02/2016 - 10/15/2017 | 2.80 | 0.22 | 3.29 | 1.14 | 0.71 | 0.72 |
| 10/16/2017 - 09/25/2018 | 2.95 | 0.23 | 3.21 | 1.07 | 0.76 | 0.74 |
| 09/26/2018 - 02/13/2020 | 2.52 | 0.23 | 2.99 | 1.12 | 0.82 | 0.73 |
| 02/14/2020 - 10/12/2020 | 2.90 | 0.25 | 2.88 | 0.86 | 1.57 | 0.81 |
| 10/13/2020 - 04/05/2021 | 2.22 | 0.33 | 2.60 | 0.92 | 1.39 | 0.84 |

73. As seen in Table 3, the ratio between those bachelor's degree recipients of a single race or national origin excluded under the CDR Policy and their share of the total bachelor's

degree recipients from schools meeting the non-CDR Eligibility Criteria ranged from 2.60 to 3.29 for Black bachelor's degree recipients and from 2.22 to 2.95 for AI/AN bachelor's degree recipients. Thus, each CDR Policy threshold excluded a disproportionate number of Black and AI/AN bachelor's degree recipients. These rates are in marked contrast to other demographic groups, who with limited exceptions where the ratio was closer to one, were excluded less than their share of the total pool.

74. The ratios in Table 3 are statistically significant at the 1 percent level, which means that, if the CDR Policy had no impact based on race, the likelihood of seeing disparities of this degree or larger is less than 1 percent.

75. Similar, disproportionate exclusions occurred during the LOS period for those earning master's and doctorate degrees from schools meeting the non-CDR Eligibility Criteria: the ratio ranged from 2.07 to 2.80 for Black master's degree recipients, from 2.26 to 4.06 for Black doctorate degree recipients, from 1.90 to 3.45 for AI/AN master's degree recipients, and from 2.15 to 2.81 for AI/AN doctorate degree recipients. These rates are in marked contrast to other demographic groups, who with limited exceptions,[8] were excluded less than their share of the total pool.

*Black and AI/AN graduates were excluded by the CDR Policy at higher rates than those not in their demographic group.*

76. As described in paragraphs 77 through 81, NCES data also illustrate that Black and AI/AN graduates were excluded by the CDR Policy at higher rates than those not in their demographic group.

77. Table 4 compares each race and national origin demographic group bachelor's

_____

[8] This ratio ranged from 1.53 to 2.67 for Hispanic doctorate degree recipients. In all other cases the ratio was closer to one.

degree recipients to all other bachelor's degree recipients outside of their race and national origin. The "relative risk ratios" in Table 4 are calculated by dividing the exclusion rate of the former group (those of a single race or national origin) by the exclusion rate of the latter group (those not in that single race or national origin). Similar to the within-group ratios described in Paragraphs 70 through 75, ratios greater than one reflect disproportionately worse outcomes; ratios less than one reflect better outcomes. As demonstrated in Table 4, Black and AI/AN bachelor's degree recipients were excluded by the CDR Policy at higher rates than those not in their demographic group.

| Table 4: Bachelor's Relative Risk Ratio | | | | | | |
|---|---|---|---|---|---|---|
| CDR Period | AI/AN | Asian | Black | Hispanic | NH/PI | White |
| 12/02/2016 - 10/15/2017 | 2.82 | 0.21 | 4.31 | 1.17 | 0.71 | 0.49 |
| 10/16/2017 - 09/25/2018 | 2.98 | 0.21 | 4.17 | 1.08 | 0.76 | 0.52 |
| 09/26/2018 - 02/13/2020 | 2.53 | 0.22 | 3.77 | 1.14 | 0.82 | 0.51 |
| 02/14/2020 - 10/12/2020 | 2.93 | 0.24 | 3.58 | 0.84 | 1.57 | 0.63 |
| 10/13/2020 - 04/05/2021 | 2.23 | 0.31 | 3.12 | 0.91 | 1.39 | 0.67 |

78. Table 4 shows, for example, that under the 10.8 CDR Policy threshold used by SouthEast between September 26, 2018 and February 13, 2020, a Black bachelor's degree recipient was 3.77 times more likely to be excluded under the CDR Policy than a bachelor's degree recipient who was not Black. It also shows that under that 10.8 CDR Policy threshold an AI/AN bachelor's degree recipient was 2.53 times more likely to be excluded by the CDR Policy than a bachelor's degree recipient who was not AI/AN. Finally, it shows that members of all other demographic groups, with limited exceptions where the ratio was closer to one, were less likely to be excluded under the CDR Policy than non-group members.

79. Similar, disproportionate exclusions occurred during the LOS period for those earning master's and doctorate degrees from schools meeting the non-CDR Eligibility Criteria: the ratio ranged from 2.38 to 3.55 for Black master's degree recipients, from 2.51 to 5.28 for

Black doctorate degree recipients, from 1.91 to 3.49 for AI/AN master's degree recipients, and from 2.16 to 2.83 for AI/AN doctorate degree recipients. These rates are in marked contrast to other demographic groups, who with limited exceptions,[9] were less likely to be excluded under the CDR Policy than non-group members.

80. The ratios in Table 4 are statistically significant at the 1 percent level, which means that, if the CDR Policy had no impact based on race, the likelihood of seeing disparities of this degree or larger is less than 1 percent.

81. Disparities for Black and AI/AN graduates consistent with those in Tables 2-4 existed for bachelor's, master's, and doctorate degree types under each CDR Policy threshold.

*Black and AI/AN bachelor's degree recipients with student loan debt were likely excluded by the CDR Policy at higher rates than those not in their demographic group.*

82. As described in paragraphs 83 through 86, proxy data illustrate that Black and AI/AN bachelor's degree recipients with student loan debt were likely excluded by the CDR Policy at higher rates than those not in their demographic group.

83. Information about the race and national origin of bachelor's degree recipients with student loan debt can be approximated using public data released through NCES.

84. Using a proxy pool of bachelor's degree recipients with student loan debt from each school meeting SouthEast's non-CDR School Eligibility Criteria, statistical analyses reveal racially discriminatory denial disparities for Black and AI/AN borrowers.

85. During the LOS period, SouthEast denied ELFI Refinance Program loans to Black bachelor's degree recipients with student loan debt at a greater rate than borrowers who were not Black based solely on the CDR of their school at the time of application. During the LOS

---

[9] This ratio ranged from 1.60 to 3.13 for Hispanic doctorate degree recipients. In all other cases the ratio was closer to one.

period, SouthEast denied ELFI Refinance Program loans to AI/AN bachelor's degree recipients with student loan debt at a greater rate than borrowers who were not AI/AN based solely on the CDR of their school at the time of application. These relative risk ratios, which ranged from 2.68 to 3.28 for Black bachelor's degree recipients with student loan debt and from 1.87 to 2.34 for AI/AN bachelor's degree recipients with student loan debt, are statistically significant at the 1 percent level.

86. These race disparities for bachelor's degree recipients with student loan debt from schools meeting the non-CDR School Eligibility Criteria were statistically significant at the 1 percent level for each CDR Policy threshold.

87. The statistical disparities in Paragraphs 83 through 86 are an appropriate proxy for, and the best available evidence of, the race disparities caused by SouthEast's CDR Policy for degree recipients with student loan debt from schools meeting the non-CDR School Eligibility Criteria.

*Majority-Black schools were overrepresented among CDR Ineligible Schools.*

88. As described in paragraphs 89 through 91, NCES data also illustrate that under the CDR Policy, majority-Black schools, defined as those schools matriculating more than 50 percent Black students in every school year ending in 2015 through 2020, were overrepresented among CDR Ineligible Schools. The share of majority-Black schools that were always excluded was also higher than the share of non-majority Black schools that were always excluded.

89. During the LOS period, majority-Black schools constituted approximately 5.25 percent of schools meeting the non-CDR School Eligibility Criteria.

90. Chart 1 illustrates how every CDR Policy threshold used by SouthEast during the LOS period excludes majority-Black schools between three and four times their 5.25 percent

share of schools meeting the non-CDR School Eligibility Criteria.



91. Chart 1 shows that during the LOS period between 18.11 percent and 20.24 percent of CDR Ineligible Schools were majority-Black. If the CDR policy had no impact based on race, the blue horizontal bars—the share of majority-Black schools excluded under each listed CDR Policy threshold—would stop at the red vertical line—the 5.25 percent share of majority-Black schools meeting the non-CDR School Eligibility Criteria. But under each CDR Policy threshold the blue bar far exceeds the red line, illustrating that majority-Black schools were excluded by the CDR Policy far more than that 5.25 percent share.

92. Table 5 shows the percent of those majority-Black schools excluded as a share of all majority-Black schools that meet the non-CDR School Eligibility Criteria, compared to the percent of those non-majority Black schools excluded as a share of all non-majority Black schools that meet the non-CDR School Eligibility Criteria.

| Table 5: Percent of Majority-Black Schools and non-Majority Black Schools Excluded by the CDR Policy | | |
|---|---|---|
| **CDR Period** | **Percent of Non-Majority Black Schools Excluded** | **Percent of Majority Black Schools Excluded** |
| 12/02/2016 - 10/15/2017 | 17.23% | 78.90% |
| 10/16/2017 - 09/25/2018 | 17.43% | 74.31% |
| 09/26/2018 - 02/13/2020 | 18.19% | 77.98% |
| 02/14/2020 - 10/12/2020 | 18.85% | 82.57% |
| 10/13/2020 - 04/05/2021 | 21.14% | 84.40% |

93. Table 5 shows stark differences between how the CDR Policy thresholds excluded

majority-Black schools and non-majority Black schools. For example, under the CDR Policy in effect from September 26, 2018 to February 13, 2020, 18.19 percent of non-majority Black schools meeting the non-CDR School Eligibility Criteria were excluded, in contrast to 77.98 percent of majority-Black schools.

94. Differences between excluded majority-Black and non-majority Black schools consistent with those in Table 5 existed under each CDR Policy threshold used by SouthEast.

**Conclusion**

95. The CDR Policy explicitly bifurcated the potential borrower population, or those graduating with student loan debt from schools meeting the non-CDR School Eligibility Criteria, based on the CDR of the school from which they received a degree. Depending on whether a school's CDR fell below or above the CDR Policy threshold, potential borrowers from that school were either allowed to proceed to the "Get My Rate" stage or denied the opportunity to refinance their student loans. This bifurcation generated a disproportionate effect that would not have existed in its absence and that applied only to a population subset overrepresented by Black and AI/AN borrowers.

96. The set of schools singled out by the CDR Policy as ineligible were disproportionately attended by Black and AI/AN students, meaning that SouthEast's CDR Policy denied Black and AI/AN graduates at disproportionate rates.

97. This result caused economic and other harm to those discriminatorily excluded under the CDR Policy. According to SouthEast, in a 2021 survey, ELFI customers reported saving an average of $278 per month, or $20,774 over the life of their loan. Some of those individuals denied by SouthEast, including those denied under the CDR Policy, were unable to reap those savings.

98. SouthEast's CDR Policy operated to deny applicants irrespective of and before considering other more accurate indicia of individual borrower risk such as individual credit score, debt-to-income ratio, or employment.

99. This CDR Policy categorically barred people from accessing ELFI Refinance Program loans based on the school they attended and SouthEast's arbitrary and varying CDR Policy threshold.

100. The higher denial rates borne by Black and AI/AN borrowers for ELFI Refinance Program loans are due to SouthEast's specific policy and practice of automatically disqualifying student loan borrowers based on where they obtained their degree.

101. SouthEast's advertising practices and referral incentives amplified the CDR Policy's discriminatory impact.

102. SouthEast failed to adequately monitor for or remedy the effects of race disparities under its CDR Policy.

103. The policies and practices described above are not justified by, or designed to achieve, a legitimate business need that cannot reasonably be achieved as well by means that are less discriminatory on Black and AI/AN applicants and potential applicants.

## EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS

104. The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

105. SouthEast's policies and practices, as alleged herein, constitute unlawful discrimination by disproportionately denying, and having the effect of denying, applicants for credit on the basis of race, in violation of ECOA, 15 U.S.C. § 1691(a)(1).

106. SouthEast's policies and practices, as alleged herein, constitute unlawful

discrimination by discouraging, and having the effect of discouraging, prospective applicants from applying for credit on the basis of race, in violation of ECOA, 15 U.S.C. § 1691(a); *see also* 15 U.S.C. § 1691e(g)-(h).

107. SouthEast's policies and practices, as alleged herein, failed to provide applicants with specific reasons for adverse actions taken, in violation of ECOA, 15 U.S.C. §§ 1691(d)(2)-(3).

108. SouthEast's policies and practices, as alleged herein, constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by ECOA, 15 U.S.C. §§ 1691-1691f.

109. Persons who have been victims of SouthEast's discriminatory policies and practices, as described herein, are applicants and prospective applicants aggrieved within the meaning of ECOA, 15 U.S.C. § 1691e, and have suffered injury and damages because of SouthEast's conduct. In addition to potentially higher direct economic costs, some of the victims of discrimination suffered additional consequential economic damages, including possible increased risk of credit problems, default, and other damages, including emotional distress.

110. SouthEast's policies and practices, as alleged herein, were intentional, willful, or implemented with reckless disregard for the rights of Black and AI/AN borrowers.

111. ECOA empowers this Court to grant such relief as may be appropriate, including actual and punitive damages and injunctive relief. 15 U.S.C. § 1691e(h).

## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter an ORDER that:

1. Declares that the policies and practices of SouthEast violate ECOA, 15 U.S.C. §§

1691-1691f.

2. Enjoins SouthEast and its agents, employees, assignees, and successors, and all other persons in active concert or participation with them, from:

    A. Discriminating on the basis of race against any person with respect to any aspect of their credit transactions;

    B. Discouraging applicants or prospective applicants on the basis of race with respect to any aspect of their credit transactions;

    C. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of SouthEast's unlawful conduct to the position they would have been in but for the discriminatory conduct; and

    D. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct in the future; to eliminate, to the extent practicable, the effect of SouthEast's unlawful practices; and to implement policies and procedures to ensure that all borrowers have an equal opportunity to seek and obtain loans on a non-discriminatory basis and with non-discriminatory terms and conditions.

3. Awards equitable relief and monetary damages to all the victims of SouthEast's discriminatory policies and practices for the injuries caused by SouthEast, including direct economic costs, consequential damages, and other damages, under 15 U.S.C. § 1691e(h).

4. Awards the United States any additional relief that the interests of justice may require.

## JURY DEMAND

The United States demands a trial by jury of all issues triable under Rule 38 of the

Federal Rules of Civil Procedure.


Dated: January 18, 2025

MERRICK B. GARLAND
Attorney General

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Chief

TAMICA H. DANIEL
Deputy Chief

*s/ Abigail Bryna Marshak*
ABIGAIL B. MARSHAK (NY Reg. No. 5350053)
SARA L. NILES (MA BBO No. 634257)
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
150 M Street, NE
Washington, DC 20530
Phone: (202) 598-0530
Fax: (202) 514-1116
Email: Abigail.Marshak@usdoj.gov